**GREAT NORTHERN RY. CO. v. LOCAL GREAT FALLS LODGE OF INTERNATIONAL ASS'N OF MACHINISTS, NO. 287, et al.**

(District Court, D. Montana. July 27, 1922, and September 8, 1922.)

No. 227.

1. **Master and servant** ⬤⟿69—**Orders of federal Labor Board advisory only.**
   The functions and orders of the federal Labor Board under the Transportation Act of 1920 are advisory only.

2. **Injunction** ⬤⟿101 (1)—**Not warranted by interference with interstate transportation, if but an unintended consequence of strike.**
   That a strike of railway employees hampers and threatens to incidentally stop the employer's interstate transportation does not warrant an

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

injunction, so long as it is but an unintended consequence of the lawful exercise of defendants' rights.

**3. Injunction ☞101(3)—Threats, force, and intimidation in connection with strike will be restrained.**

Threats, force, and intimidation perpetrated by members of a labor union in the promotion of union interests in connection with a strike, and reasonably likely to be repeated, will be restrained.

**4. Trade unions ☞8—Liable for acts of members to some extent.**

All voluntary associations, including labor unions, are responsible to some extent on the theory of agency for the acts of their members, and acts not authorized may be ratified expressly or by implication.

**5. Injunction ☞114(3)—Trade union may be enjoined on failure to discipline members guilty of intimidation, etc., in connection with strike.**

It is not sufficient for a labor union, whose members are on strike, to repudiate their acts in the conduct of the strike, where it does not discipline them sufficiently to prevent repetition; and where some of a union's members, by threats, force, and intimidation, have inflicted and threaten to inflict irreparable injury on the employer's right to carry on interstate transportation, the union and its members may be restrained.

**6. Trade unions ☞8—Not liable for the acts of other unions and their members engaging in strike.**

Labor unions, merely because they are such, are not liable for the acts of other unions and their members in the conduct of a strike in which the members of all of the unions are engaged.

**7. Injunction ☞101(2)—Rights permitted strikers under statute specified.**

Under Clayton Act, §§ 19, 20 (Comp. St. §§ 1243c, 1243d), providing that striking employees shall not be restrained from recommending, advising, or persuading others by peaceful means to quit work, etc., strikers may go to the very line between the lawful and the unlawful, and may use art, eloquence, oratory, and logic to accomplish persuasion, and indulge in fair, vigorous, and repeated argument.

**8. Injunction ☞189—Number of pickets permitted in connection with strike discretionary, and governed by circumstances.**

Under Clayton Act, § 20 (Comp. St. § 1243d), providing that strikers shall not be restrained from attending at any place where they may lawfully be, for the purpose of exercising persuasion, etc., the number of pickets which will be permitted is governed by circumstances within the discretion of the chancellor.

**9. Injunction ☞101(3)—Acts of strikers held insufficient to require injunction.**

That strikers had distributed circulars of questionable propriety and had conducted excessive picketing, which had been abandoned, and that a number of men, including one defendant, abused a number of employees, and that threats were made and anonymous letters sent by unidentified persons, *held* not sufficient to move the discretion of the court to grant an injunction.

**10. Injunction ☞101(1)—Granted only in cases of urgent necessity to prevent injuries reasonably to be apprehended.**

In controversies between employers and employees, as in other cases, injunctions are granted only in cases of urgent necessity, to guard against injuries, not merely feared, but reasonably to be apprehended, and likely to be irreparable.

**11. Injunction ☞128—Urgent necessity must be shown by competent, material, credible, and preponderating evidence.**

The urgent necessity for an injunction must be made to appear by competent, material, credible, and preponderating evidence.

**12. Injunction ☞1—Granted with caution, in exercise of discretion.**

Injunctions are extraordinary remedies, granted with great caution, and in the exercise of sound judicial discretion.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

13. **Injunction ⊜➡101(2)—Infringement on right to work does not entitle employer to injunction against strikers, except as it affects employer.**

Infringement by strikers on the right of employees to work does not entitle the employer to an injunction, except to the extent that it is part of unlawful methods, inflicting irreparable injury to the employer's property rights.

14. **Injunction ⊜➡101(2)—Not granted against peaceful persuasion, though interstate transportation interrupted.**

In view of Clayton Act, § 20 (Comp. St. § 1243d), the interruption of interstate transportation in consequence of peaceful persuasion in connection with a strike is damnum absque injuria, and an injunction is not warranted under section 16 (section 8835c), in connection with Anti-Trust Act July 2, 1890 (Comp. St. §§ 8820–8823, 8827–8830).

In Equity. Suit by the Great Northern Railway Company against the Local Great Falls Lodge of the International Association of Machinists, No. 287, and others. On application for temporary injunction. Injunction granted.

I. Parker Veazey, Jr., W. L. Clift, and R. H. Glover, all of Great Falls, Mont., Frank C. Walker and H. C. Hopkins, both of Butte, Mont., and Gunn, Rasch & Hall, of Helena, Mont., for plaintiff.

W. P. Costello, of Great Falls, Mont., J. P. Donnelly, of Havre, Mont., and Wheeler & Baldwin, of Butte, Mont., for defendants.

BOURQUIN, District Judge. This is a hearing upon the interstate railway corporation plaintiff's application to restrain, pending suit, alleged activities of the labor union defendants. No restraining order issued, and a situation fraught with possibilities of grave irreparable injury requires prompt decision. This, the temporary nature of the proceedings and relief, and the evidence, admit of brevity, without sacrifice of any necessary detail or of clarity.

The parties are in the throes of the nation-wide railway strike of July 1, 1922. To plaintiff's charge that defendants, in their refusal to abide by the federal Labor Board's wage scale, "strike against the United States," defendants counter that the associated railroads, in their analogous refusals in respect to some of the board's orders, first and likewise strike.

[1] Of the board's functions and orders it suffices to say they are advisory only, the teeth having been drawn from the bill for the Transportation Act (41 Stat. 456). Perhaps the strike may be characterized as mutual, in that relations between the parties are severed because plaintiff refuses to sell its opportunities for labor to defendants, save on its terms, and defendants refuse to sell their labor to plaintiff, save on their terms.

Be that as it may, as always in like struggles, the third party in interest, society, the general public, is ground between the upper and nether millstones of what it characterizes as the mutual selfishness of servitors in quasi public employment. It justly suffers, for that it fails to sufficiently control, as it rightfully can, the activities of both parties, and it will pay the price.

[2] The strike hampers and threatens to incidentally stop plaintiff's interstate transportation. This is not unlawful, and warrants no injunction, so long as but an unintended consequence of lawful exercise of defendants' rights. Although in conflict in some particulars, the evidence is clear and undisputed in sufficient others to disclose that plaintiff's efforts to continue train service are virtually nullified by threats, force, and intimidation inflicted upon such employees as it secures.

These evil acts include excessive masses or groups on or too near plaintiff's premises, libelous epithets and names, unpeaceful domiciliary visits, undue restraint, deportation, and threats of bodily injury, in part executed, and which are committed by men singly and in concert, at various times and places. Plaintiff alleges all this is in execution of a conspiracy entered into by defendants to coerce plaintiff from applying the wage scale aforesaid, and defendants deny the charge. It is admitted by plaintiff the national organizations, with jurisdiction over defendants, command the use of none but lawful methods, and it is asserted by defendants they obey, but cannot restrain their members, if disposed to disobey. This assertion is supported by the evidence and accepted as true for the purpose of this proceeding.

[3] Taking into consideration the facts and circumstances in evidence, it is beyond reasonable doubt that some of defendants are afflicted with members who, in and about promotion of union interests in the strike, of their own volition at various times and places have perpetrated the threats, force, and intimidation aforesaid, and are reasonably likely to repeat them. These unlawful practices, though not yet of magnitude, are in proportion to plaintiff's immediate efforts to fill vacancies, and may grow by what they feed upon. They are like to an incipient blaze in a forest, which, if not controlled, will grow and spread, until it covers the land with smoke and fire, death and destruction. And that is the reason why their continuance must be restrained by a court of equity. If in the emergency defendants cannot restrain their members, it is the duty of the court in law enforcement to do so, therein serving the best interests of defendants no less than those of plaintiff, nor overlooking those of the third party aforesaid.

[4, 5] All voluntary associations, including labor unions, for acts of their members are responsible to some extent on the theory of agency. Acts not authorized may be ratified, expressly or by implication. It is not always enough to repudiate the acts, for, unless the members are disciplined sufficiently to prevent repetition, the inference that the associations approve, even as they profit by, the acts, may be inevitable, despite the most solemn disavowal of them. The associations can preserve their integrity against impairment by rebellious members, for they have power to control, and even expel, the latter, if necessary. In present circumstances, suits are brought against the association by name, and thus against all the members.

The reason is found in the association's responsibility and control aforesaid, in the great number of members, in the sometime difficulty to know names of all proceeding unlawfully, in the necessity to have

jurisdiction over all members, so that if those presently law-abiding in turn practice lawlessness, the penalty (of justice, not vengeance) is swift and sure, and in the necessity on occasion to distinguish the innocent from the guilty. In view of the finding that members of some of defendants, by threats, force, and intimidation, inflict and threaten to inflict irreparable injury within the meaning of that term upon plaintiff's property right to carry on interstate transportation, the law is settled and clear, and virtually conceded by defendants, that plaintiff is now entitled to therefrom restrain such defendants and their members.

These are the unions and members of Great Falls, Havre, Whitefish, and Wolf Point. In respect to the third and fourth, service of a short-day notice was not made upon them in time to enable them to appear and defend herein. For that reason, only a temporary restraining order will issue against them, to continue during the suit, unless on notice hereof, to be given by plaintiff forthwith, they fail to show cause otherwise before the court at Butte on August 7, 1922.

[6, 7] In respect to the defendants of Butte, Lewistown, and Judith Gap, there is no evidence of the charge against them. That they are unions, like the others, imposes no liability for what are acts of others only. In respect to the terms of the order, it is proper to observe that they must be within section 20 of the Clayton Act (Comp. St. § 1243d), which provides that in strikes ex-employees shall not be restrained "from recommending, advising, or persuading others by peaceful means" to quit work, or to refuse to work for the employer, nor "from attending at any place where any such person or persons [ex-employees] may lawfully be, for the purpose of peacefully obtaining or communicating information" or to exercise persuasion as aforesaid, nor "from peaceably assembling in a lawful manner, and for lawful purposes." The order must also comply with section 19 of the act (section 1243c), viz.: "Specific in terms, and shall describe in reasonable detail * * * the act or acts sought to be restrained."

It must be remembered the strike is lawful, and both parties thereto, if so foolish, to put it mildly, as to persist in disagreement, are to have the fullest freedom within the law, each to promote its or their success over the other—that is, plaintiff to secure employees, if it lawfully can; defendants to prevent, if they lawfully can. They are equally entitled to receive from the court protection against intimidation, and any order of restraint, though in terms directed to one party alone, even as any like order in any suit, imposes correlative restraint upon the other. Its office is protection, and not a shelter for aggression. If abused, a pen may unmake it as a pen hath made. The court's order is to restrain defendants from exceeding the bounds of the Clayton Act, but not to intimidate them from enjoying all within those bounds. In the exercise of the rights that the Clayton Act assures to defendants, they may go to the very line between the lawful and the unlawful, carefully avoiding crossing into forbidden territory.

So may any person in the exercise of any right; and all because no right can be maintained, but by its fearless, vigorous, and full enjoyment. By the Clayton Act Congress recognizes the necessity and value

283 F.—36

of labor unions and labor activities in the matter of conditions of employment; that they have done and are yet capable of a great work; that to the workman and his, a job is life, wherein eternal vigilance is no less the price of a worthy job than of liberty; and that its loss too often changes the current of human lives and spells disaster. Hence the Clayton Act, to aid his last ditch struggle to retain his job against all comers. To that end the act provides the workmen may "recommend, advise and persuade," and by all lawful means fairly within the import of those terms. All art, eloquence, oratory, and logic are open to the workmen to accomplish persuasion.

Fair, vigorous, and repeated argument is legitimate. Repeated, for what fails to convince to-day may succeed on rehearing to-morrow, even in a Supreme Court. No reason appears why workmen may not model after congressional oratory (some expurgated), or after what is fairly inferable in the consultation room of the Supreme Court on occasion, say, of some decision by the odd justice. Human nature is everywhere alike, and every man is or ought to be earnest, enthusiastic, and fearless in his own, if good, cause. It is not believed that the American Steel Foundries Case, 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. ——, decided by the Supreme Court on December 5, 1921, imports otherwise. In it is no clear purpose to denature or "weasel" the act, and limit workmen to methods akin to pink teas and scented notes of invitation. They have their own virile vocabulary and manner, and, so long as within the Clayton Act, there is no censor upon their use. Where Congress gives bread, the courts will not convert it to stone.

[8] The principal thing is that workmen conscientiously heed the mandate of the law and its instruments (the courts) that threats and force and their intimidation must not be used to promote success in strikes, and that of necessity, theirs as well as others, such methods always have been and always will be under the ban and criminal. In respect to pickets, defendants will be allowed two at any point of access to plaintiff's premises where men usually or may be expected to enter. If the entrants are numerous, perhaps more may be necessary. The Clayton Act, by "person or persons," intends that the number of agents shall be governed by circumstances. Obviously, not otherwise could the object of the act be attained.

So, too, the cited case recognizes as always the discretion of the chancellor in respect to pickets. Furthermore, it has happened that pickets need the support of numbers, if only for corroboration. Force and violence are strangers to neither party to strikes, and either may give a Herrin for a Ludlow. The parties forget that aggression incites retaliation, and violence breeds violence. Then, too, the pickets of one are generally confronted, if not overawed, by armed guards of the other, and by police, sheriffs, and marshals, who too often forget they are public officers, with duty to protect both parties, and mistakenly assume they are partisans of one party or the other.

Nor is it believed that the act bans the mere name. Labels go for nothing, and still does a rose by any other name smell as sweet. So-called militant terms are invoked by the church and all noble enterprise, not to arouse belligerency, but to inspire necessary enthusiasm. Why

deny to workmen equality in their use? Strikes and agents to observe or watch and persuade being lawful, and beyond the power of courts to forbid, in recognizing the fact it is hardly seemly to censor mere names, or to quibble over them.

Order accordingly, and effective on bond in the sum of $5,000. Either party may move to modify the order as circumstances may require.

At the hearing on August 21, 1922, pursuant to the foregoing decision of July 27, 1922, the defendants of Wolf Point and Whitefish resist extension of the temporary injunction to specifically include them. The evidence in respect to those of Wolf Point reasonably requires such extension. At least, they have been too insistent that employees attend at the unions' hall, where information, statements, argument, and manner exceeded persuasion, and savored of the abusive and menacing, calculated to incite, as was incited, fear, intimidation, and departure from plaintiff's employment and the town. ·

[9] In respect to those of Whitefish it is otherwise. The only competent, material, and preponderating evidence tends to show that circulars for which defendants may be responsible are of questionable propriety; that perhaps excessive picketing was indulged, but abandoned before suit commenced; that employees have received anonymous threatening letters; that one employee was threatened by an unidentified man; and that several men, unidentified, but including one identical in name with defendant Bugg, and presumably he, orally abused a number of employees swimming in a lake, thrust some circulars upon them, and Bugg complained of them for indecent exposure and procured their arrest. The circulars are too trivial as the basis of injunction; the anonymous letters, without more, cannot be imputed to defendants; the charge of excessive picketing comes only at this hearing, and was preceded by a charge of only threatened excessive picketing; defendants appear only by counsel, and so cannot meet it, and, if a fact, was abandoned before suit commenced and not likely to be repeated; the threat is in the same category as the anonymous letters; and the alleged abuse at the lake is also first presented at this hearing, and by affidavit of one employee only, with defendants unable to meet it. The whole is little, in view of near two months of strike (the restraining order in force three weeks) and 150 men involved, and is not to be accepted as sufficient to move the discretion of the court to grant an injunction.

[10-12] It is emphasized that the principles applicable to injunctions are the same in controversies between employers and employees as in any others. Injunctions go only in cases of urgent necessity, made to appear by competent, material, credible, and preponderating evidence, to guard against injuries, not merely feared by the applicant, but reasonably to be apprehended, and likely to be irreparable. They are extraordinary remedies, granted with great caution, and in the exercise of sound judicial discretion. That the applicant is annoyed, threatened, and injured will never justify a court to grant him an injunction, unless these trespasses are so great that they threaten him with irreparable injury, within the settled meaning of that term in equity.

Experience warns against injunctions upon only affidavits to vital issues, and that may surprise defendants.. The evidence that may well warrant an emergency restraining order, until hearing can be had upon the application for an injunction, may fall short to justify the latter. As no one is to be subjected to injunction merely because it will not injure him (though an unwarranted injunction is an indignity, and always injurious), before he is enjoined a sufficient case must be legally made out against him.

In strikes, employers too often with little cause are quick to seek injunctions and their intimidating advantages, and courts too often likewise grant them. The consequence is a disposition to view the courts as partisans of the employers, and the judicial writs of injunction as weapons against employees however lawfully they be proceeding. And it is of this Pandora's box of obvious evils to society that the Clayton Act is designed to somewhat close the lid.

These controversies inevitably present provocative situations, and may involve fugitive encounters and disorders, for which neither party may be solely responsible. Often trivial, they do not threaten irreparable injury, and so do not warrant interposition by a court of equity, but can be adequately remedied by appeal to local authority. It may be, as contended, that near election time local administrations are disposed to neglect duty in the premises and to "play politics." But for that matter national administrations are likewise. It is of the price, as of the vice, of democracies. Nevertheless, injunctions go only in the circumstances aforesaid, and not merely to bridge gaps of administrative dereliction.

[13] The right of employees, of men, to work (of which so much is heard during strikes, and so little other times), is but incidental, and aids plaintiff none. However much that right be infringed, plaintiff cannot complain, save to the extent that it is part of unlawful methods inflicting irreparable injury to plaintiff's property rights. The right itself is not absolute, but qualified—the right to sell labor if a buyer be found, to solicit a job (and often hopelessly and unavailingly), and to work if and as long as the buyer or job giver consents and no longer. Society has not yet progressed to insure work, or to recognize a substantial interest in a job had, though perhaps the spirit of the times, if not their necessity, even as the Clayton Act, tends in the direction of the latter at least.

[14] In respect to the contention that the Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), in connection with section 16 of the Clayton Act (Comp. St. § 8835o), warrants injunction against even peaceful persuasion of employees to cease work, if the result otherwise is interruption of plaintiff's interstate transportation, it is unmaintainable. The interruption, an unintended consequence of lawful exercise of a right sanctioned by the law before and since the acts aforesaid, sanctioned by section 20 of the latter act aforesaid, is damnum absque injuria, and not within said acts, so far as injunctive relief is concerned.

In the matter of defendants' request that the order enjoin plaintiff from maintaining more guards than pickets where the latter are stationed, if and when it is made to appear that guards in any number

are infringing upon defendants' rights, a corrective can be applied. The order in respect to the number of defendants' agents or pickets can be amended when necessity is made to appear, as suggested in the earlier and foregoing decision. Neither that decision nor this assumes to limit the number composing any defendants' groups for persuasion only. What is reasonable and only persuasive is a safe guide.

Order accordingly, effective on bond in the sum of $5,000.