## CUSANO et al. v. NATIONAL LABOR RELATIONS BOARD.

### No. 10404.

United States Court of Appeals
Third Circuit.

Argued May 22, 1951.

Filed Aug. 16, 1951.

899

Samuel J. Davidson, Hoboken, N. J.
(DeFazio, Davidson & DeFazio, Hoboken,
N. J., on the brief), for petitioners.

Arnold Ordman, Washington, D. C.
(George J. Bott, Gen. Counsel, David P.
Findling, Associate Gen. Counsel, A. Nor-
man Somers, Asst. Gen. Counsel, Mark C.
Curran, Washington, D. C., Attorney, Na-
tional Labor Relations Board, on the brief),
for respondent.

Before GOODRICH, STALEY and
HASTIE, Circuit Judges.

**900**

STALEY, Circuit Judge.

This case is before us on a petition of the employer ("petitioner") to review and set aside an order issued against it by the National Labor Relations Board. In its answer, the Board has requested enforcement of its order. This court has jurisdiction under Sections 10(e) and 10(f) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(e) and (f). The amended complaint of the Board, issued July 27, 1950, asserts that the petitioner has engaged in unfair labor practices within the meaning of Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1) and (3).

The facts are as follows: Petitioner is engaged in the manufacture of shuffleboards, cabinet work products, and related products, in the State of New Jersey. On January 21, 1949, two of petitioner's employees, Silakowski and Peduto, were discharged for taking part in a "slow down" at petitioner's Union City plant. Immediately following the discharges, a majority of the employees met with two union representatives[1] and voted to strike unless Silakowski was reinstated. When knowledge of the proposed strike came to the ears of Paul Cusano, the general partner and chief executive of petitioner, he assembled the employees of the Union City plant and made a speech. In this speech, delivered January 24, 1949, Cusano told the employees that he had heard reports about the intended walkout. He then read them a copy of a notice which had just been placed on the bulletin board. The notice read, "Any man leaving his job without reason judged to be legitimate by the undersigned, or any man leaving his job during the working day without good and sufficient reason, *will be considered as having quit his job* and will not be re-hired un-

der any circumstances. * * *[2] (Emphasis in original.)

On January 25, 1949, the union filed with the Board a petition for certification as the exclusive bargaining agent for the employees at the Union City plant. On February 2, a meeting was held at the Board's regional office in New York City. In attendance, in addition to the Board's field examiner, were Davidson, attorney for petitioner, Wagner, the business representative of the union, and Paladino, an elected representative of the employees. The parties agreed to execute an agreement for a consent election. Upon the field examiner's request for a figure as to petitioner's volume of interstate business so that it might be incorporated into the consent agreement, Davidson disclosed, with reluctance,[3] that petitioner's interstate purchases and sales for the year 1948 each were in excess of $500,000.

The next morning Paladino made a full report of the conference to the shop committee which had been elected by the employees; included in his report was Davidson's information relating to petitioner's volume of interstate business. Cusano testified that there was considerable confusion in the plant that morning and that several employees reported to him that the confusion was caused by statements made by Paladino that petitioner had earned $500,000 in profits during the year 1948.

At lunch time a number of employees were huddled in a group outside the plant; among them was Paladino. Suddenly Cusano dashed excitedly from the plant, made his way toward Paladino, and demanded to know whether Paladino had spread the false report regarding petitioner's profits for 1948. Paladino answered that he had merely reported to the committee exactly what had transpired at the conference. Cusano's testimony, how-

1. Marine Warehousemen of New Jersey, Local 1478, International Longshoremen's Association, A.F.L.

2. A copy of Cusano's speech was mailed to each employee.

3. The circumstances under which Davidson disclosed this information are sharply disputed. He testified that he disclosed the figure of interstate business only after exacting a promise from all in attendance that it would be kept in strict confidence; Paladino and Wagner deny such a promise was exacted.

ever, is that Paladino finally admitted that he had made the misstatement. This, Paladino denied, and his version of the "conversation" is corroborated by several witnesses. The Board found that Paladino had denied Cusano's accusations in substance.

That afternoon Paladino was discharged. An explanatory notice, signed by Cusano, was placed on the bulletin board,[4] declaring that Paladino had been discharged because he had deliberately and maliciously lied by stating that petitioner made fantastic earnings during the last year.[5]

On February 10, 1949, 43 of the 55 employees at petitioner's Union City plant went out on strike. All agree that the strike was the result of postponement by the Board of the representation election, which had been scheduled for February 11. The strikers erroneously believed that petitioner was responsible for this postponement. On February 10, 11, and 12, Paul Cusano on behalf of petitioner wrote letters to each of the employees. In the letter of February 11, he asserted, *inter alia,* "Because this strike is one to compel the employer to violate the law against its will, any man who fails to return to work at the above time is to consider himself automatically discharged. Any existing picket line is part and parcel of a conspiracy to compel us to violate the law and you should have no hesitancy to cross such a line." The letter of February 12 declares: "Any advice which you may have received to the effect that you cannot be

discharged for not coming in to work on Tuesday morning, is all wrong. The plant is open despite the wildcat strike called by an unauthorized Union. Again I repeat, And This Is Important to You and Your Job, call the National Labor Relations Board (Murrayhill 9–8730) to determine whether or not I can discharge you under the present circumstances for your failure to return to work on Tuesday morning. Make this phone call yourself. * * *" (Emphasis in original.)

The Board found that Cusano's speech of January 24 and the notice posted that day, and the letters of February 11 and 12 constituted violations of Section 8(a) (1) of the Act in that they interfered unlawfully with activities protected by Section 7. It also found that Paladino had been discharged because of his union activities and that this was a violation of Sections 8(a) (1) and 8(a) (3) of the Act. The order of the Board requires petitioner, *inter alia,* to cease and desist from engaging in the above unfair labor practices, to reinstate Paladino with back pay, and to post appropriate notices.

In support of its petition to set aside the Board's order, petitioner contends that there is not sufficient evidence to support the Board's finding as to the unfair labor practices.

Petitioner asserts that Cusano's speech of January 24 and the letters of February 11 and 12 were merely expressions of opinion by the employer and, as such, protected by Section 8(c) of the

---

4. The notice was as follows:

"February 3, 1949

"Notice

"As of tonight, I am discharging Peter Paladino because he deliberately and maliciously lied to his fellow-workers when he told them that this company made fantastic earnings this past year. He knew that this was untrue and admitted the fact when I questioned him before you.

"He did this to create bad blood between you men and myself.

"We have always lived harmoniously here and I intend that this relationship

shall continue. That relationship cannot continue with Paladino in the plant.

"Paul Cusano
(Sgd.) Paul Cusano"

5. The following day Paladino applied for reinstatement. Cusano's assistant informed him that he would be rehired if he signed a suitable statement. Paladino, however, refused to sign the tendered statement. The proposed statement, if signed by him, would have constituted an admission that he had actually made the misstatement. A witness for petitioner admitted that soon afterwards Cusano, in response to a telephone inquiry, had recommended Paladino for another job.

Act.[6] We cannot agree with this contention. The facts of this case are strikingly similar to those we considered recently in N.L.R.B. v. Electric City Dyeing Co., 3 Cir., 1950, 178 F.2d 980. In fact, the language used in this case is stronger, and the threats more obvious, than in the Electric City Dyeing case. Employees who engage in an economic strike do not lose their status as employees. National Labor Relations Board v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. To threaten the striking employees with discharge if they engaged in or refused to abandon lawful organizational activity constituted coercion and interference within the meaning of Section 8 (a) (1). N.L.R.B. v. Electric City Dyeing Co., supra.

■ There is an implication in petitioner's argument that the threatened strike of January 24 and the strike commenced on February 10 were in some sense unlawful, so that the employees were no longer protected by the Act. Cf. National Labor Relations Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627. The discharge of Silakowski and Peduto was admittedly not an unfair labor practice. A strike by the employees in order to force petitioner to reinstate the discharged men may have been unwise or unjustified, but this does not render it unlawful. See National Labor Relations Board v. Mackay Radio & Telegraph Co., supra; Firth Carpet Co. v. N.L.R.B., 2 Cir., 1942, 129 F.2d 633; Sax v. N.L.R.B., 7 Cir., 1948, 171 F.2d 769. Similarly, the strike in protest of the postponement of the election may have been unwarranted; but we are not persuaded that it can be termed unlawful. See Firth Carpet Co. v. N.L.R.B., supra.

■ Petitioner contends that Paladino was discharged for cause, and not because he was engaged in activities protected by the Act. Paladino was discharged, petitioner urges, because he falsely stated that its 1948 profits exceeded $500,000. The Intermediate Report of the trial examiner concluded that Paladino did not spread a false report about petitioner's earnings, and the Board adopted this finding. There was no ear-witness testimony supporting petitioner's contention that Paladino made false statements. Moreover, the employees who allegedly so informed Cusano were not produced at the hearing. Paladino's version of the occurrences of February 3, on the other hand, was corroborated by several witnesses. We think the Board's finding that Paladino had not in fact made false statements as to profits is supported by substantial evidence on the record considered as a whole. 29 U.S.C.A. § 160(e). See Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456.

■ Petitioner urges as an alternative argument that whether or not a discharged employee actually makes a false statement is irrelevant so long as the employer reasonably believes he did and so long as the employer actually discharges the employee on the strength of that belief. It is true that an employer may discharge an employee for a good reason, a bad reason, or no reason at all. N.L.R.B. v. Condenser Corp., 3 Cir., 1942, 128 F.2d 67, 75; N.L.R.B. v. Electric City Dyeing Co., supra. This rule, however, is necessarily limited where an employee is engaging in activities protected by the Act. The right of a union official or representative to inform his fellow employees of the proceedings at the Board's regional office is certainly one of the activities so protected. To adopt petitioner's view would materially weaken the guarantees of the Act, for the extent of employees' protected rights would be made to vary with the state of the employer's mind. We conclude that if the conduct giving rise to the employer's mistaken belief is itself protected activity, then the

6. "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C.A. § 158(c).

employer's erroneous observations cannot justify the discharge.[7]

As its second ground for setting aside the Board's order, petitioner urges upon us the contention that the action had been barred because the unfair labor practices alleged in the Board's amended complaint occurred more than six months prior to the filing of the amended charge. Petitioner relies on Section 10(b) of the Act, 29 U.S.C.A. § 160(b), the relevant portion of which declares: *"Provided,* That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *."

The original charge was filed on February 15, 1949, and alleges that petitioner has engaged in unfair labor practices within the meaning of Section 8(a) (1) of the Act. It further avers that, "On or about February 3, 1949, by its officers, agents and employees, [petitioner] terminated the employment of Peter Paladino because of his activities on behalf of Marine Warehousemen of N.J., local 1478 A.F.L. and since, has refused, and does now refuse, to reemploy said employee."

The amended charge, filed on June 19, 1950, alleges that petitioner has violated not only Section 8(a) (1) of the Act, but also Section 8(a) (3). It then declares, "On or about February 3, 1949, the above-named employer terminated the employ-ment of its employee Peter Paladino because of his membership in and activities in behalf of the labor organization named below *and because he engaged in other concerted activities * * *."* (Emphasis supplied. The portion in italics represents that part of the charge added by the amendment.)

Petitioner's argument is that the amended charge sets up a different legal and factual situation from the one contained in the original charge; hence the amended charge cannot be related back to the original charge. Petitioner asserts that the complaint based on the amended charge violates Section 10(b) of the Act since the acts complained of occurred more than six months prior to the filing of the amended charge.

We must reject petitioner's argument, for it seems clear to us that both the original and amended charges are based on the identical fact situation—the discharge of Paladino. The allegation that petitioner violated Section 8(a) (3) in addition to Section 8(a) (1) is, at most, a slight change in the legal theory.[8]

The employer, upon being served with a copy of the charge, will make certain to retain pertinent records, interrogate witnesses and, in a general way, prepare his defense, pending issuance by the Board of a formal complaint. So long as the amended charge is sufficiently related to the original that the employer will not be prejudiced in those respects, we think the

---

7. This is analogous to the cases holding that once it is made to appear from the primary facts that the employer has violated the express provisions of the Act, then his motives are not relevant. See N.L.R.B. v. Hudson Motor Car Co., 6 Cir., 1942, 128 F.2d 528; N.L.R.B. v. Gluek Brewing Co., 8 Cir., 1944, 144 F.2d 847.

Alternatively, the Board held that even if Paladino's report were erroneous, his conduct would still constitute protected activity so long as the misrepresentation was merely inadvertent, and not malicious. (There is no evidence in the record to support petitioner's contention that Paladino's statements were deliberately false.) We need not pass on this holding.

8. A charge is not a pleading. The function of a charge under the Act is merely to provide the spark which starts the machinery of the Act running. See Kansas Milling Co. v. N.L.R.B., 10 Cir., 1950, 185 F.2d 413; National Labor Relations Board v. Indiana & M. Electric Co., 1943, 318 U.S. 9, 18, 63 S.Ct. 394, 87 L. Ed. 579. The Board proceeds to make an inquiry, and it is on the basis of that inquiry that the formal complaint is issued by the Board. 29 U.S.C.A. §§ 160 (b), 161. Even if we were concerned with a formal pleading, rather than a mere charge, we think the amendment would be held to relate back to the original date. See Rule 15(c), Federal Rules of Civil Procedure, 28 U.S.C.A.

intent of Congress is faithfully carried out.[9] We conclude that the complaint in this case was issued in conformance with Section 10(b) of the Act. See Kansas Milling Co. v. N.L.R.B., 10 Cir., 1950, 185 F.2d 413; Cathey Lumber Co. v. N.L.R.B., 5 Cir., 1951, 185 F.2d 1021, affirming per curiam the Board's Decision in 86 N.L. R.B. 157.

A decree for the enforcement of the Board's order may be submitted.

9. The Report of the House Committee on Education and Labor on H.R. 3020 states, "It has not been unusual for the Board, in the past, to issue its complaints years after an unfair labor practice was alleged to have occurred, and after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused." Rep. #245, 80th Cong. 1st Sess., p. 40. It may be noted that the bill originally passed by the House of Representatives provided not only that a charge must be filed within six months after the occurrence of the unfair labor practice, but that a complaint must be issued within six months of the filing of the charge. The latter provision is not in the Act as finally approved. See Statement of Managers, House Report #510, 80th Cong., 1st Sess., U.S. Code Cong. Serv., 1947, 80th Cong., 1st Sess., p. 1159.